## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NAVAJO NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-1909 (TSC) |
| | ) | |
| DEPARTMENT OF THE INTERIOR, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Navajo Nation (the "Nation") alleges that the Bureau of Indian Affairs ("BIA"), an agency within the United States Department of the Interior ("DOI"), violated the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* (the "ISDEAA"), by failing to disperse calendar year ("CY") 2014 funding to the Nation according to the Nation's proposed CY 2014 annual funding agreement (the "Proposal"). Specifically, the Nation contends that DOI Secretary Sally Jewell (the "Secretary") failed to approve or decline the Proposal within the statutorily-mandated 90-day window for doing so and that, as a result, the Proposal must be deemed approved as a matter of law.[1]

The parties have each moved for summary judgment. Upon consideration of the parties' motions and supporting briefs, and for the reasons set forth below, the Nation's motion for summary judgment is hereby **DENIED**, and DOI's cross-motion for summary judgment is hereby **GRANTED**.

---

[1] While a named defendant in this action, Secretary Jewell is sued only in her official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

## I.      BACKGROUND

Congress enacted the ISDEAA in 1975 to help Indian tribes assume responsibility for government programs that benefit their members.  Under the ISDEAA, federally recognized Indian tribes may enter into what are termed "self-determination contracts" with federal agencies.  These self-determination contracts enable Indian tribes to take control of a variety of federally funded programs that would otherwise be administered on their behalf by the federal government.  *See generally* 25 U.S.C. § 450f.

After a tribe and an agency, such as DOI, memorialize this transfer of authority in a self-determination contract, they negotiate annual funding agreements, which become part of the contract once they are approved by the agency's secretary.  When a tribe submits a proposed annual funding agreement to DOI, "the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification" to the tribe that one of five statutory reasons for rejection applies.  *Id.* § 450f(a)(2).[2] "[T]he Secretary may extend or otherwise alter the 90-day period . . . if before the expiration of such period, the Secretary obtains the voluntary and express written consent of the tribe" to do so.  *Id.*  "A proposal that is not declined within 90 days (or within any agreed extension [] ) is deemed approved."  25 C.F.R. § 900.18.

The Nation is a federally recognized Indian Tribe with its seat of government at Window Rock, Arizona.  In 2012, the Secretary and the Nation entered into a self-determination contract under the ISDEAA whereby the federal government would fund the Nation's judicial operations for five years – from January 1, 2012 through December 31, 2016 (the "Contract").

---

[2] 25 C.F.R. § 900.6 defines "Secretary" to include persons to whom the Secretary has delegated authority.  In this case, the Secretary delegated authority to act on the Nation's Proposal to certain BIA employees.

(*See* Compl. Ex. A).  The Contract requires the parties to negotiate a separate funding agreement for each calendar year that it covers.  (*See id.*).

Due to a lapse in congressional appropriations during the 2013 government shutdown, BIA was unable to operate normally between October 1 and October 16, 2013.  (*See* Compl. Ex. I).  On October 4, 2013, Ronald Duncan, a contract analyst for the Nation, hand-delivered the Proposal to Raymond Slim at the receptionist's desk of the Self-Determination Office in BIA's Navajo Regional Office.  (*See* Compl. Ex. C ¶¶ 8-11; Defs.' Cross-Mot. Ex. B ¶ 11).  BIA has consistently taken the position that Slim, as an exempt employee whose salary was funded by non-lapsing multi-year appropriations for road construction contracts, was only authorized to receive and work on road construction contracts during the government shutdown, not self-determination contracts and their associated funding agreement proposals.  (*See* Compl. Ex. I; Defs.' Cross-Mot. Ex. B ¶ 10).  Notably, Duncan admits that he knew that he was delivering the Proposal during a government shutdown.  (*See* Compl. Ex. C ¶ 8).

Upon receiving the Proposal, Slim marked it for intra-office mail delivery to Jeannette Quintero, the BIA official "responsible for making award and declination decisions for Navajo Nation contracts" under the ISDEAA.  (Defs.' Cross-Mot. Ex. B ¶¶ 1, 11).[3]  Due to the lapse in appropriations, however, Quintero was furloughed during the shutdown, as were all of the other employees in the Regional Office other than Slim, and there was no intra-office mail delivery, which meant that the Proposal was not delivered to Quintero until October 17, 2013, when normal governmental operations – including intra-office mail delivery – resumed.  (*Id.* ¶¶ 10-11).

On October 21, 2013 – two business days after normal governmental operations resumed – BIA sent a letter to the Nation acknowledging its receipt of the Proposal.  (*See* Compl.

---

[3] As noted above, 25 C.F.R. § 900.6 defines "Secretary" to include persons to whom the Secretary has delegated authority, such as Quintero.

Ex. D).  The letter stated that, due to the government shutdown, "which included mail delivery to [its] office," BIA considered the Proposal to have been received on October 17, 2013.  (*Id.*).[4] The letter also explicitly stated that BIA had until "90 days after October 17, 2013 to approve, decline, or award the [P]roposal," and that this "90-day period will end on <u>January 15, 2014</u>." (*Id.*) (emphasis in original).  Lastly, the letter directed the Nation to contact Quintero or her colleague Frances Price if it had any questions.  (*See id.*).  The Nation did not respond to this letter.

On November 7, 2013, BIA sent another letter to the Nation, this time identifying substantial changes between the Proposal and the CY 2013 annual funding agreement, including the fact that the Nation's requested budget amount had increased by over $15 million, from about $1.3 million in CY 2013 to over $17 million in CY 2014.  (*See* Defs.' Cross-Mot. Ex. D).  The letter requested that the Nation respond to BIA's concerns by November 29, 2013 so that BIA could complete its review of the Proposal, and stated that BIA would "hold the approval" of the Proposal until the Nation submitted certain documents.  (*Id.*).  The letter also directed the Nation to contact Quintero, Price or their colleague Daniel Largo, Jr. if it had any questions.  (*See id.*). As with the October 21 letter, the Nation did not respond to the November 7 letter.

If the Proposal was properly considered "received" on October 4, 2013 (and not on October 17, as BIA stated in its October 21 letter), then the 90-day window for the Secretary to act on it closed on January 2, 2014 (and not on January 15, as BIA stated in its October 21

---

[4] The ISDEAA requires BIA to notify an Indian tribe of a proposal's receipt within two days. *See* 25 C.F.R. § 900.15(a); *see also id.* § 900.6 (defining the word "days" in section 900.15(a) to mean "calendar days; except where the last day of any time period specified in these regulations falls on a Saturday, Sunday, or a Federal holiday, the period shall carry over to the next business day").  Accordingly, if the Proposal was received on Thursday, October 17, 2013, BIA complied with section 900.15(a) by acknowledging receipt on Monday, October 21, 2013. But if the Proposal was received on October 4, 2013, then BIA failed to comply with section 900.15(a) because it acknowledged receipt 17 days later.

letter).  But January 2 came and went without BIA approving or declining the Proposal, or sending any further communications to the Nation aside from its unanswered October 21 and November 7 letters.

On January 9, 2014, BIA sent a letter to the Nation requesting a 45-day extension to the 90-day window – which, per the October 21 letter, BIA understood to be closing six days later, on January 15, 2014.  (*See* Compl. Ex. E).  BIA stated that it was requesting the extension so that the Nation could have additional time to respond to the issues raised in BIA's November 7 letter.  (*See id.*).  Again, the letter directed the Nation to contact Quintero, Price or Largo if it had any questions.  (*See id.*).  As with BIA's October 21 and November 7 letters, the Nation did not respond to the January 9 letter.

On January 15, 2014 – the last day of the 90-day window that BIA had established in its October 21 letter – BIA sent the Nation a letter partially declining the Proposal.  (*See* Compl. Ex. F).  BIA authorized approximately $1.3 million in funding, which was in line with the Nation's CY 2013 budget, but was only about one-thirteenth of the approximately $17 million that the Nation had requested for CY 2014.  (*See id.*).  According to Quintero's declaration, the reasoning behind BIA's partial declination did not change between its November 7 letter and its January 15 letter, such that the agency could have issued the partial declination any time after November 7, 2013.  (Defs.' Cross-Mot. Ex. B ¶ 19).  Quintero further explains that, had the Nation notified BIA of its position regarding the date the Proposal was received and the resulting deadline, the agency would have issued its partial declination on that deadline – January 2, 2014 – in order to give the Nation the maximum amount of time to respond to the concerns it had raised in its November 7 letter without triggering 25 U.S.C. § 450f(a)(2).  (*See id.* ¶ 22; *cf.* Compl. Ex. F).

On January 27, 2014, the Nation sent BIA a letter asserting that the 90-day review window had actually closed on January 2, 2014 – *i.e.*, 90 days after the Nation delivered the Proposal to the Regional Office on October 4, 2013, in the middle of the government shutdown. (*See* Compl. Ex. G).  The letter stated that BIA's partial declination thirteen days later on January 15, 2014 was therefore untimely, and that the Proposal was automatically deemed approved as a matter of law as of January 2, 2014.  (*See id.*).

On February 4, 2014, BIA sent the Nation a letter providing additional information as to why the Proposal was partially declined.  (*See* Compl. Ex. H).  This letter did not address the Nation's January 27 letter.  (*See id.*).

On February 7, 2014, BIA responded to the Nation's January 27 letter, setting forth its view as to why its partial declination of the Proposal was timely:

> Pursuant to 25 C.F.R. 900.16, "[t]he Secretary has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal."  "Secretary" is defined as the "Secretary of Health and Human Services (HHS) or the Secretary of the Interior (DOI), or both (and their respective delegates)." 25 C.F.R. 900.6.  The hand-delivery of the [Proposal] to Mr. Raymond Slim did not constitute receipt by the Secretary.  Mr. Slim was an exempt employee during the government shutdown because his salary is funded from non-lapsing appropriations relating to roads construction contracts.  Although Mr. Slim is located in the NRO Self-Determination Office, he was not authorized to perform work on any Pub. L. 93-638 programs during the shutdown except for contracts related to road construction.  In particular he was not authorized to work on the [Proposal].
>
> During the government shutdown, no employees in the NRO Self-Determination Office were designated as excepted employees authorized to work on self-determination contracts generally, or for the purpose of working on the [Proposal]. Accordingly, there was no employee within NRO who was authorized to receive or work on the [Proposal] on behalf of the Secretary during the government shutdown. The first day that any NRO employee was authorized to receive or work on the [Proposal] was October 17, 2013.  Thus, the 90-day review period did not begin until October 17, 2013, and continued through January 15, 2014, the day the partial declination letter was issued.  The partial declination was thus issued within the 90-day period.

(Compl. Ex. I).

In March 2014, the Nation submitted a claim to BIA under the Contracts Disputes Act, 41 U.S.C. § 7101 *et seq.*, which authorizes parties to submit contract-based claims to government contracting officers for decision.  (*See* Compl. Ex. K).  BIA denied the Nation's claim in May 2014.  (*See* Compl. Ex. L).

The instant action was filed in November 2014.  The parties now cross-move for summary judgment.

## II.    LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.").  The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The non-movant is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.   ANALYSIS

The core dispute in this case centers on when the statutorily-mandated 90-day clock for responding to the Proposal began to run.  The Nation claims that the clock began to run on October 4, 2013, when it hand-delivered the Proposal to its local BIA office.  DOI disagrees, and contends that, because the Proposal was delivered during the 2013 government shutdown, it was not actually "received" by the agency until normal governmental operations resumed about two weeks later on October 17, 2013, at which point the 90-day clock began to run.  Because the Secretary partially declined the Proposal exactly 90 days after October 17, she acted in a timely manner according to DOI's clock, but in an untimely manner according to the Nation's clock.

Both parties have marshaled several arguments as to why the court should agree with their position on when the Proposal was received.  DOI also argues that, even if the court agrees with the Nation that the Proposal was received on October 4, 2013 – meaning that the Secretary's deadline for responding to it was January 2, 2014 – then either (i) that deadline should be equitably tolled because of the unique circumstances presented by the government

shutdown, or (ii) the amount of funding requested by the Nation should be rejected because it grossly exceeds what is called "the Secretarial Amount."

The court need not determine the validity of any of these arguments, however, because it agrees with another of DOI's arguments, which is dispositive of the parties' motions:  That the Nation should be equitably estopped from asserting the January 2, 2014 deadline because of its silence in response to BIA's October 21, 2013 and November 7, 2013 letters, which made clear the agency's understanding that its deadline for acting on the Proposal was January 15, 2014.

\* \* \*

"Equitable estoppel means that 'he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted.'" *Auster v. Ghana Airways Ltd.*, 514 F.3d 44, 48 (D.C. Cir. 2008) (quoting *Dickerson v. Colgrove*, 100 U.S. 578, 580 (1879)).  Equitable estoppel requires: "(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted."  *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011).[5]

In order to establish estoppel by silence, there must be "'both the specific opportunity and apparent duty to speak.'"  *Wiser v. Lowler*, 189 U.S. 260, 272 (1903) (quoting *Viele v. Judson*, 82 N.Y. 32, 40 (1880)).  In order to create a duty to speak, it is essential that "'the party

[5] The court notes that, in arguing against equitable estoppel, the Nation cites to a number of cases where courts found that estoppel was inappropriate as against the government.  But the instant case presents the reverse scenario – here, the government is seeking to estop a non-governmental entity.  The cases cited by the Nation are therefore inapposite, and the heavier burden that applies when a private party is seeking to estop the government does not apply here.

maintaining silence knew that someone else was relying upon that silence, and either acting or about to act as he would not have done, had the truth been told.'" *Id.* (quoting *Viele*, 82 N.Y. at 40); *see also* 28 Am. Jur. 2d *Estoppel and Waiver* § 57 (2016) ("The rule is that a person who stands by and sees another about to commit, or in the course of committing, an act infringing on his or her rights, and fails to assert his or her rights or title, will be estopped from thereafter asserting them.  The principle underlying such estoppels is embodied in the maxim 'one who is silent when he ought to speak will not be heard to speak when he ought to be silent.'") (footnotes omitted).  Equitable estoppel also "requires a weighing of the equities."  *Smirnov v. Clinton*, 487 F. App'x. 582, 585 (D.C. Cir. 2012) (per curiam).

The evidentiary record in this case demonstrates that:

- The Nation hand-delivered the Proposal to its local BIA office on October 4, 2013, during a prolonged government shutdown, and purports to have believed that the 90-day window for the Secretary to respond to the Proposal would therefore close on January 2, 2014 (*see* Compl. Ex. C ¶ 8; Compl. Ex. G);

- Two business days after the shutdown ended and normal governmental operations resumed, BIA sent the Nation a letter acknowledging its receipt of the Proposal and explaining that, (i) because of the shutdown, it considered the Proposal to have been received on October 17, 2013, and (ii) as a result, the agency would be operating off of a January 15, 2014 deadline in responding to it (*see* Compl. Ex. D);

- A few weeks later, BIA sent a letter to the Nation (i) identifying its concerns about the Proposal; (ii) requesting a response to those concerns; and (iii) stating that it would "hold the approval" of the Proposal until certain documents were submitted to it (Defs.' Cross-Mot. Ex. D);

- The Nation did not respond to either of these letters, despite the fact that (i) it purportedly believed that BIA was operating off of the wrong deadline; (ii) it knew that BIA was holding its decision on the Proposal, meaning that – unless it received the documentation it requested from the Nation – BIA would wait to act on the Proposal until the deadline off of which it was operating had arrived, and would therefore miss the earlier deadline that the Nation, unbeknownst to BIA, believed to be correct; and (iii) each of BIA's letters directed the Nation to contact the agency if it had any questions (*see* Compl. Ex. D; Defs.' Cross-Mot. Ex. D);

- BIA partially declined the Proposal on January 15, 2014 – the exact date that its original October 21, 2013 letter provided as its deadline for acting on the Proposal (*see* Compl. Ex. F);

- The Nation's first response to BIA's letters (i) was on January 27, 2014; (ii) responded only to BIA's January 15, 2014 partial declination letter; and (iii) asserted for the first time that the deadline was not January 15, 2014, but was actually January 2, 2014 (*see* Compl. Ex. G); and

- BIA could have issued its partial declination any time after November 7, 2013, and would have done so by January 2, 2014 had the Nation stated its position as to the applicable deadline at any time prior to that date (*see* Defs.' Cross-Mot. Ex. B ¶¶ 19, 22).

The Nation offers no explanation for why it did not attempt to correct BIA's purportedly incorrect date of receipt and its resulting deadline calculation after receiving the October 21 and November 7 letters.  Instead, it simply claims that it had no duty to speak and "engaged in no affirmative misconduct," and that BIA could not rely on its silence for purposes of equitable estoppel:

> [T]he Nation made no definite representation to the BIA.  It merely submitted its Proposal and awaited agency action.  The Nation had no duty to state to the BIA the Nation's position that the regulations required BIA to act by January 2, 2014; the BIA is the Nation's trustee, not the other way around.  The Nation engaged in no affirmative misconduct.  The Secretary did not reasonably rely on even the silence of the Nation; she is represented by counsel and should have known that ISDEAA and her own regulations allow an extension of the 90-day deadline in only one instance – if the tribe consents.  And the Secretary did not change her position for the worse in reliance on anything the Nation did.

(Pl.'s Resp. at 30).

DOI disagrees, and argues that the Nation had a duty to speak because it knew that BIA was basing its calculation of the 90-day statutory deadline off of an October 17, 2013 receipt date.  DOI contends that BIA was "relying upon that silence and that [it] would have acted differently had [the Nation] spoken."  (Defs.' Resp. at 17-18).

The court agrees with DOI, and finds that the record establishes the existence of all of the elements needed for the court to equitably estop the Nation from asserting the January 2, 2014 deadline.

As an initial matter, while the Nation may have believed that BIA's deadline for acting on the Proposal was January 2, 2014, it knew from BIA's October 21, 2013 letter that the agency believed the deadline to be almost two weeks later, on January 15, 2014.  The letter directed the Nation to contact BIA if it had any questions about the date of receipt and deadline set forth therein.  The letter therefore gave the Nation an opportunity to speak, but the Nation chose not to avail itself of that opportunity.

Moreover, the Nation subsequently learned from BIA's November 7, 2013 letter that the agency would be holding its approval of the Proposal until it received certain documents from the Nation.  This letter again directed the Nation to contact BIA if it had any questions, and again the Nation did not do so.  Indeed, the Nation's failure to send BIA the documents it had requested or otherwise respond to the November 7 letter essentially ensured – because of the aforementioned hold on the Proposal's approval – that action on the Proposal would not come until BIA's January 15 deadline, after which date the Proposal would be automatically approved.  *See* 25 U.S.C. § 450f(a)(2).  The Nation therefore knew *in November 2013* that BIA would miss the purported January 2 deadline.  But rather than providing the documents BIA requested or otherwise addressing the matter of the date of receipt and applicable deadline with the agency, the Nation waited silently for January 2 to pass before claiming that BIA had missed the deadline and was therefore obligated to award the Nation the full amount of funds it sought in the Proposal – an amount approximately thirteen times the amount it received the previous year.

The record also belies the Nation's claim that BIA "did not change [its] position for the worse in reliance on anything the Nation did."  (Pl.'s Resp. at 30).  The record shows that the

reasoning behind BIA's partial declination did not change between its November 7, 2013 and January 15, 2014 letters, such that the agency could have issued the partial declination any time after November 7, 2013.  (Defs.' Cross-Mot. Ex. B ¶ 19).  The record also demonstrates that, had the Nation notified BIA of its position prior to January 2, 2014, the agency would have issued its partial declination by that date, which would have prevented the Nation from being able to argue that the Proposal was automatically approved pursuant to 25 U.S.C. § 450f(a)(2).  (*See id.* ¶ 22).

These facts establish the requisite duty to speak because they show that the Nation was well aware of the fact that BIA was relying on its silence in believing that both parties were on the same page as to the deadline being January 15, 2014.  And despite the Nation's carefully hedged assertion that it "engaged in no *affirmative* misconduct" (Pl.'s Resp. at 30) (emphasis added), the record leads inexorably to the conclusion that the Nation maintained its silence in bad faith, as common honesty and fair dealing compelled it to speak, and not remain silent in the hope that BIA would wait until its own secret deadline had passed.  *See*, *e.g.*, 28 Am. Jur. 2d *Estoppel and Waiver* § 57 ("There must be some element of turpitude or negligence connected with the silence or inaction by which the other party is misled to his or her injury. . . . Generally, a person is required to speak only when common honesty and fair dealing demand that he or she must do so, and in order that a party may be estopped by silence, there must be on his or her part an intent to mislead, or at least a willingness that others should be deceived, together with knowledge or reason to suppose that someone is relying on such silence or inaction and in consequence thereof is acting or is about to act as he or she would not act otherwise.  Thus, to work an estoppel, silence must amount to bad faith.") (footnotes omitted).

Of course, "[o]ne cannot claim an estoppel based on silence where he or she had actual knowledge of the facts or the means of acquiring knowledge," or "where the parties have equal knowledge of the facts or the same means of ascertaining that knowledge."  31 C.J.S. *Estoppel*

*and Waiver* § 124 (footnotes omitted).  But this is not the case here.  BIA did not have "actual" or "equal knowledge" of the Nation's position as to when the 90-day clock started running and what the deadline was, as the Nation kept its position on these matters to itself until after that purported deadline had passed.  Nor did BIA have any "means of acquiring" such knowledge, given the Nation's silence.  Accordingly, since the Nation kept its position as to the deadline a secret, its silence requires that it be estopped from asserting that deadline, as the record demonstrates that BIA reasonably read the Nation's silence as acquiescence to the date of receipt and deadline spelled out in the October 21 letter, and that it would have acted before January 2 passed if not for its reliance on the Nation's silence.

BIA was also materially prejudiced by the Nation's silence.  "The courts are especially disposed to uphold a claim of estoppel by silence or inaction where one party with full knowledge of the facts has stood by without asserting his or her rights or raising any objection while the other party, acting on the faith of such apparent acquiescence, incurred large expenditures that will be wholly or partially lost if such rights or objections are subsequently given effect."  28 Am. Jur. 2d *Estoppel and Waiver* § 57 (footnotes omitted).  Here, while BIA did not incur large expenditures on the basis of the Nation's apparent acquiescence, it clearly relied on it in a manner that, according to the Nation, exposes the federal government to more than $15 million in liability under 25 U.S.C. § 450f(a)(2).

The balance of the equities also tips in favor of estopping the Nation from asserting the January 2, 2014 deadline.  As noted above, the record demonstrates that the Nation acted in bad faith by maintaining its silence where common honesty and fair dealing demanded that it speak.  Moreover, the Proposal was only partially declined, and the Nation was still awarded approximately $1.3 million, which was roughly the same amount of funds that it had received for CY 2013.  BIA, on the other hand, (i) adhered to the deadline that it set out in its very first piece

of correspondence to the Nation after receiving the Proposal; (ii) informed the Nation of its

concerns about the Proposal shortly thereafter; (iii) gave the Nation ample opportunity to

respond to those concerns; (iv) informed the Nation that it would hold its approval of the

Proposal until certain documents were submitted to it; and, after receiving no response to its

entreaties, (v) only declined that portion of the Proposal that exceeded what had been awarded to

the Nation the prior year, and (vi) did so on January 15, 2014, thereby giving the Nation as much

time as it possibly could to submit the aforementioned documents without running afoul of

25 C.F.R. § 900.18.  In short, the record demonstrates that BIA acted diligently and in good faith

in working on the Proposal.  Under the circumstances present here, the court will not sanction the

Nation's gamesmanship in taking advantage of a government shutdown by rewarding it with the

windfall that it seeks.  Instead, the court finds that the Nation is equitably estopped from

asserting the January 2, 2014 deadline, and that BIA's January 15, 2014 partial declination was

therefore timely.

## IV.    CONCLUSION

For the reasons set forth above, the Nation's motion for summary judgment is hereby

**DENIED**, and DOI's cross-motion for summary judgment is hereby **GRANTED**.  An

appropriate Order accompanies this Memorandum Opinion.


Date:  March 30, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

15